In re **MIRANT CORPORATION, et al., Debtors.**

**Mirant Corporation, et al., Plaintiffs,**

v.

**Potomac Electric Power Company and The Federal Energy Regulatory Commission, Defendants.**

**Bankruptcy No. 03–46590–DML–11. Adversary No. 03–4342.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Sept. 23, 2003.

Monica Susan Blacker, Andrews & Kurth LLP, Dallas, TX, for Intervenor–Plaintiff.

Judith Elkin, Robin Eric Phelan, Haynes and Boone, Dallas, TX, Ian T. Peck, Haynes and Boone, Ft. Worth, TX, for Plaintiff.

Andrea L. Niedermeyer, Stutzman, Bromberg, Esserman & Plifka, Dallas, TX,

Beth Guralnick Pacella, Fedreal Energy Regulatory Commission, Washington, DC, for Defendant.

### *CORRECTED Memorandum Opinion**

DENNIS MICHAEL LYNN,
Bankruptcy Judge.

Before the court is the question of whether, and to what extent, the court should continue by preliminary injunction relief granted temporarily by its *Ex Parte* Temporary Restraining Order Against Potomac Electric Power Company and the Federal Energy Regulatory Commission (the "TRO")[1] entered by the court on August 28, 2003. Besides the *ex parte* hearing held by the court on the morning of August 28, the court held a hearing the afternoon of August 28 in which the Commission participated by telephone and Potomac Electric Power Company ("Pepco") participated by telephone and through counsel in the courtroom. The court held a telephone status conference with the parties on September 9,[2] and on September 10 received argument, the testimony of Lisa Johnson ("Johnson"), an officer of Plaintiffs, and numerous exhibits. On September 12, Pepco supplemented the record with a transcript of the deposition of Johnson, the Back–to–Back Agreement (as hereafter defined), the Affidavit of John

W. Ragan, a transcript of a hearing held in these cases on July 30, 2003, and Notices of Deposition and its Requests for Production of Documents for Mirant Americas Energy, L.P., Mirant Mid–Atlantic, LLC, and Mirant Corporation. Pepco or the Commission also asked that the court take notice of certain prior proceedings in Plaintiffs' chapter 11 cases.

The TRO was entered on the Motion of Plaintiff for *Ex Parte* Temporary Restraining Order (the "TRO Motion"). The TRO Motion was filed in furtherance of Plaintiffs' Complaint for Declaratory Judgment, Temporary Restraining Order and Preliminary Injunction (the "Complaint"), by which Plaintiffs seek various forms of relief, including that addressed in this Memorandum Opinion. The TRO Motion was supported by declarations of Johnson and Wayne A. Cross. Plaintiffs have filed in support of their request for injunctive relief both an initial memorandum ("Plaintiffs' Memorandum") and a reply (the "Reply") to memoranda filed with the court in opposition by the Commission and Pepco (respectively the "Commission Response" and the "Pepco Response" and collectively the "Responses").

This matter is subject to the court's jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(b)(1) and (2).[3]

---

* This Memorandum Opinion has been corrected to cure typographical and similar errors. The rulings of the court and the reasoning underlying them remain the same.

1. The TRO contained language added in the court's hand meant to extend its reach to all contracts between Debtors and Potomac Electric Power Company. On September 10 the court clarified limitations on the effect of the TRO. The court directed that such limitations would become effective at noon, Fort Worth time on September 12. During the morning of September 12, Plaintiffs sought from the court additional temporary injunctive relief against the Federal Energy Regulatory Commission (the "Commission") which included

those areas delimited on September 10. Following a hearing, in which the Commission participated by telephone, the court granted the relief and entered a second temporary restraining order (the "September 12 TRO").

2. The status conference also concerned other matters brought before the court by the Commission and Pepco. These are described below.

3. As discussed below, the Commission and Pepco have filed a joint motion for withdrawal of the reference (the "Withdrawal Motion"). The court considered it necessary to address the preliminary injunction prior to

This Memorandum of Law constitutes the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052.

## I. *Background*

Plaintiffs are Debtors in cases commenced in this court under chapter 11 of title 11 of the Bankruptcy Code (the "Code") on July 14, 2003, and thereafter. They presently act as debtors in possession of their estates and operate their business (sections 1107 and 1108 of the Code). Two creditors' committees have been appointed in these cases, but no examiner or trustee has been appointed for any of the Debtors.

Debtors are engaged in the business of producing and selling energy products and in the trade of energy products. Much of Debtors' business falls within the jurisdiction of the Commission.

Through an Asset Purchase and Sale Agreement (the "APSA") entered into between Debtors[4] and Pepco, Debtors acquired Pepco's energy generation facilities.[5] In connection with this acquisition, Debtors became obligated under agreements made by Pepco to purchase or sell power on certain terms and conditions. By the Complaint and a companion motion to reject under Code section 365(a) (the "Rejection Motion"), Debtors seek to be relieved of their obligation to perform under one of these agreements (the "Back-to-Back Agreement," which incorporates various letter agreements and has been

the subject of prior litigation[6]). In the Complaint Debtors also seek to prevent any action by Pepco or the Commission to limit the relief Debtors might obtain pursuant to section 365 of the Code with respect to two Transition Power Agreements (the "TPAs"). The Back-to-Back Agreement essentially requires that Debtors purchase from Pepco power which Pepco is obligated to purchase from certain third parties. The terms of Pepco's obligations run as long as 18 more years. The TPAs require Debtors to provide power to Pepco at fixed prices.[7] One of the TPAs expires in June 2004 and the other in January 2005.

At this time the court need not address the merits of the Rejection Motion or deal directly with the TPAs. Rather, the court must address Debtors' request that the Commission be prohibited from ordering that Debtors perform the Back-to-Back Agreement and the TPAs.

Debtors assert that they require such relief because of the conduct of the Commission in the Chapter 11 case of *NRG Energy, Inc.*, Case No. 03-13024(PCB), pending in the bankruptcy court for the Southern District of New York. In that case the debtor filed a motion to reject a power supply contract contemporaneously with the filing of its chapter 11 petition. Certain state regulatory authorities then sought and obtained an order from the

---

the Withdrawal Motion to avoid the necessary expiration of restraints on the Commission and Pepco before the matter could be reached by the District Court.

**4.** The APSA was actually between Pepco and Southern Energy, Inc., from which Debtors are descended.

**5.** Deregulation legislation required Pepco to divest itself of these assets. Pepco provides electric utility services to consumers in the Washington, D.C., area.

**6.** The history of the Back-to-Back Agreement is described in *Public Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*, 375 Md. 185, 825 A.2d 462 (2003).

**7.** Though Debtors are obligated to provide power to Pepco under the TPAs, Pepco has the option of instead obtaining the power from other sources.

Commission directing that the debtor perform the supply contract pending the Commission's determination whether termination of the contract was in the public interest.[8] Following entry by the bankruptcy court of an order authorizing rejection of the supply contract, the Commission ruled that, notwithstanding its rejection, the Commission could require the debtor to continue performing the agreement.[9] The Commission also determined that, if the petitioning parties were prohibited by the automatic stay applicable in bankruptcy cases (section 362 of the Code) from commencing proceedings before it, the Commission itself could and would initiate such a proceeding.[10]

Debtors claim that they have reason to fear the same sort of action in their cases by the Commission or Pepco (or parties incited by Pepco). Thus, Debtors filed the Complaint and the TRO Motion to protect their "right" to reject the Back–to–Back Agreement and the TPAs.[11] The court will address Debtors' concerns below, in part IV.C.1.b of this Memorandum Opinion.

The court was persuaded by the Complaint and the TRO Motion to enter the TRO. Following entry of the TRO and the August 28 afternoon hearing, the Commission and Pepco filed the Responses and the Withdrawal Motion. Between then and the September 10 hearing, the Public

Service Commission of Maryland, the Maryland Office of People's Counsel, and the Office of the People's Counsel of the District of Columbia filed actions with the Commission asking for relief that would preempt this court's consideration of the Rejection Motion (the "FERC Actions"). At the hearing on September 10, counsel for the Commission advised the court that counsel believed the Commission, despite the TRO, might have sent out notices to begin processing the FERC Actions.[12]

## II. *Issues*

To begin with, it is necessary for the court to specify what it is *not* deciding in this Memorandum Opinion. Obviously, the court is not reaching the merits of the Rejection Motion, nor will the court address the TPAs in any other than the injunctive context. Plaintiffs, in their Memorandum and in the Complaint, have suggested that the court determine that the automatic stay would prohibit any order of the Commission directing that Debtors perform the Back–to–Back Agreement or the TPAs. The court does conclude that Pepco is barred from seeking such relief by section 362(a) of the Code, which provides that the commencement of a case halts the commencement or continuation of a judicial or administrative proceeding against a debtor. There is therefore no need for injunctive relief directed against Pepco: the court is confident Pepco and its

---

8. *Blumenthal v. NRG Power Mktg., Inc.,* 103 FERC 61,188, 2003 WL 21130626 (2003); *Blumenthal v. NRG Power Mktg., Inc.,* 103 FERC 61,344, 2003 WL 21480251 (2003), reh'g denied, 104 FERC 61,213 (2003).

9. *Blumenthal v. NRG Power Mktg., Inc.,* 103 FERC 61,188 at ¶8, 2003 WL 21130626 (2003); *Blumenthal v. NRG Power Mktg., Inc.,* 103 FERC 61,344 at ¶1, 2003 WL 21480251 (2003), reh'g denied, 104 FERC 61,213, 2003 WL 21983920 (2003).

10. *Blumenthal v. NRG Power Mktg., Inc.,* 103 FERC 61,344 at ¶54, 2003 WL 21480251

(2003), reh'g denied, 104 FERC 61,213, 2003 WL 21983920 (2003).

11. Debtors are continuing performance under the Back–to–Back Agreement and the TPAs.

12. During the hearing on September 12 on the September 12 TRO, counsel for Plaintiffs advised the court that, though notices had not been issued by the Commission before the September 10 hearing, the Commission did issue such notices on September 11.

counsel understand and will obey the automatic stay. However, the court also concludes that section 362(b)(4)[13] provides an exception from the automatic stay that permits the Commission to act with respect to Debtors in furtherance of its regulatory powers.[14] Having so held, the court must determine whether the extraordinary restraint embodied in the TRO should be continued against the Commission. In doing this, the court is faced with two issues:

1. May a bankruptcy court enjoin the Commission?

2. In this case, should the court enjoin the Commission from ordering Debtors to perform the Back–to–Back Agreement and the TPAs?

### III. *Positions of the Parties*

#### A. Plaintiffs

Plaintiffs argue that the Commission should be enjoined from initiating or considering any action before the Commission with regard to the Back–to–Back Agreement or the TPAs pursuant to section 105 of the Code. Plaintiffs argue that section 105 authorizes the court to enjoin conduct otherwise excepted from the automatic stay and that in this case the requirements for a section 105 injunction are met: Plaintiffs have a strong likelihood of succeeding on the merits, Debtors will be irreparably harmed if injunctive relief is not granted, Defendants will suffer no irreparable harm if injunctive relief is granted, and the public interest is served by such relief.

Plaintiffs further argue that, because there is no exception to section 365 of the Code for contracts subject to the Commission's jurisdiction, this court has ample power to enjoin the Commission where necessary to carry out such a core bankruptcy function as contract rejection. Debtors urge that the injunction would not usurp the Commission's power or constitute rate making, the principal concern of the Commission and an area specifically preserved for it in section 1129(a)(6) of the Code.

#### B. Pepco

In its response, Pepco urges that the Federal Power Act (the "FPA"), 16 U.S.C. § 791, *et seq.*, vests exclusive jurisdiction and authority in the Commission to regulate the Plaintiffs' wholesale power obligations in order to protect the public interest. Pepco further argues that the Commission's exercise of its jurisdiction and authority under the FPA is exempted and preserved by the Code because (1) the court in NRG held that the Code does not divest the Commission of its exclusive jurisdiction and authority under the FPA; (2) the Code's automatic stay exempts the Commission's exercise of it's exclusive jurisdiction and authority under the FPA; and (3) the Code's rejection provision does not preempt the Commission's exercise of

---

13. Section 362(b)(4) states:
 The filing of a petition under section 301, 302, or 303 of this title . . . does not operate as a stay—
 . . . (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an

action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

14. The court need not address at this juncture whether an order of the Commission directing Debtors to perform the Back–to–Back Agreement (*i.e.*, pay Pepco as required by the Back–to–Back Agreement) would amount to "enforcement of a . . . money judgment" and so be outside the exception provided by section 362(b)(4) of the Code.

its exclusive jurisdiction and authority under the FPA.

Finally, Pepco argues that Plaintiffs have not established the requirements necessary to obtain preliminary injunctive relief, including a showing irreparable harm.[15] Instead, Pepco urges that Pepco and Pepco's customers will be irreparably harmed if the injunction is continued and, therefore, the injunction is contrary to the public interest.

## C. The Commission

The Commission takes the position that the police or regulatory exception to the automatic stay applies to protect from *any* bankruptcy court interference Commission action regarding the "FERC-jurisdictional Mirant agreements." Additionally, the Commission asserts that Plaintiffs fail to show entitlement to section 105 relief. The Commission argues that this is because (1) section 105 relief can only be applied in exceptional circumstances; (2) to obtain section 105 relief Plaintiffs must, but cannot, satisfy the standards of the All Writs Act; and (3) even if this were a proper case for injunctive relief, Plaintiffs fail to show that they are entitled to such relief because Plaintiffs are unlikely to prevail against the Commission, have not shown irreparable harm, and the harm to third parties and the public interest weighs against injunctive relief.

## IV. *Discussion*

## A. The Court May Enjoin the Commission

The answer to the first issue presented to the court requires analysis of two subor-dinate questions. First, is the Commission specifically insulated from injunctive relief? Second, may a bankruptcy court enjoin an administrative agency, including the Commission?

■ Although the court has been cited to no case in which a bankruptcy court has enjoined the Commission and has found none itself, District Courts have often determined they could provide such injunctive relief. *See Ace–Fed. Reporter v. FERC*, 1993 WL 518641, *2, 1990 U.S. Dist. LEXIS 13823, at *12 (D.D.C. Oct. 16, 1990) (enjoining the Commission from awarding stenographic services contract to any entity other than plaintiff); *Winslow v. Fed. Energy Regulatory Comm'n*, 1987 WL 11082, *7–10, 1987 U.S. Dist. LEXIS 14493, *23–31, (D.D.C. May 7, 1987) (enjoining the Commission from discriminating against the plaintiff in the future on account of the plaintiffs age and because the plaintiff initiated an employment discrimination action).[16] Though often District Courts are reversed on appeal on this issue, it is because the court's injunction, unlike in the case at bar, effected a collateral attack on an order of the Commission. *See Consolidated Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*, 611 F.2d 951, 957–58 (4th Cir.1979) (stating that injunction was not proper because there is no area of review of Commission orders available in the district court). There is, however, no prohibition in the FPA that bars a court otherwise having jurisdiction from preventing the Commission from entering an order in the first place and certainly no provision similar to the prohibition on injunctive relief which was central to the

---

15. Pepco analyzes harm to Debtors in terms of dollars. As discussed below (and as stated by the court at the September 10 hearing), though huge amounts of money are at stake, the assessment of harm must be made on another basis.

16. *See also Chevron U.S.A., Inc. v. FERC,* 193 F.Supp.2d 54 (D.D.C.2002) (orders dated January 1, 2002 issued in accordance with the opinion enjoined the Commission from enforcing various Commission orders regarding Commission procedures).

decision in *Bd. of Governors v. MCorp Financial*, 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). Hence the court concludes there is no absolute bar to enjoining the Commission.

■ As to the second question, the bankruptcy court is a unit of the District Court. 28 U.S.C. § 151. Jurisdiction over bankruptcy matters is vested in the District Courts, *id.* § 1334, and then referred to the bankruptcy courts. *Id.* § 157(a).[17] Thus, subject to orders of the District Court, the bankruptcy court is vested with whatever jurisdiction the District Court could exercise, with exceptions not here material—*e.g.* 28 U.S.C. § 157(b)(3). That jurisdiction is broad and, for many purposes, exclusive (28 U.S.C. § 1334(a) and (e)).

The Code gives to a court exercising bankruptcy jurisdiction the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a). Section 105 is in sharp contrast to its predecessor under the Bankruptcy Act of 1898, section 2a(15) (former 11 U.S.C. § 11a(15)), which provided that only the District Court, not the bankruptcy court, could enjoin a court. Section 105(a), through the elimination of the restriction contained in the prior law, strongly suggests that Congress intended that a bankruptcy court could enjoin another tribunal when appropriate.

Indeed, if the Commission has not previously been enjoined by a bankruptcy court, numerous other administrative agencies have been. *See, e.g., NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 699 (8th Cir.1985) (affirming bankruptcy court's injunction against NLRB); *In re Hunt*, 93

B.R. 484, 491–98 (Bankr.N.D.Tex.1988) (enjoining Commodities Futures Trading Commission); *In re Bulldog Trucking, Inc.*, 150 B.R. 912, 916 (W.D.N.C.1992) (enjoining Interstate Commerce Commission); *In re Richmond Paramedical Servs., Inc.*, 94 B.R. 881, 882 (Bankr. E.D.Va.1988) (enjoining Department of Health and Human Services); *In re Vantage Petroleum Corp.*, 25 B.R. 471, 477 (Bankr.E.D.N.Y.1982) (enjoining Department of Energy).

Caselaw also supports, in appropriate circumstances, use by the bankruptcy court of section 105(a) of the Code to prohibit conduct otherwise permitted by virtue of one of the exceptions to the automatic stay of section 362(b). *See In re Fussell*, 928 F.2d 712, 713 (5th Cir.1991) (determining that criminal proceedings may be enjoined); *In re Techs. Int'l Holdings, Inc.*, 234 B.R. 699, 702 (Bankr. E.D.Ky.1999) (enjoining state); *In re Richmond Paramedical Servs., Inc.*, 94 B.R. at 882 (holding that bankruptcy court may enjoin federal administrative proceedings when they threaten the debtor's estate); *In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 792 (Bankr.N.D.Cal.1987) (holding that bankruptcy court may enjoin state environmental reclamation order).

The court thus concludes that it *may* enjoin the Commission. The question that remains, however, is more difficult: *should* the court enjoin the Commission in this case?

**B. This Court May Exercise Effective Jurisdiction Over the Back–to–Back Agreement and the TPAs**

The key element to determining whether the court *should* enjoin the Commission

---

**17.** The District Court for the Northern District of Texas has entered a general order of reference pursuant to section 157(a). *See* Misc. Order No. 33, Local Rule of the Northern District of Texas Concerning Bankruptcy Cases and Proceedings, Dec. 21, 1982 at (c)(1).

is whether the court has jurisdiction to authorize, pursuant to section 365 of the Code, rejection[18] of the Back–to–Back Agreement and the TPAs such that Debtors are excused from performing them. The Commission takes the position that these contracts fall within its regulatory ambit and are subject to its exclusive jurisdiction. Pepco argues that, while this court may authorize rejection of the Back–to–Back Agreement and the TPAs, the court may not prevent the Commission from exercising its jurisdiction to direct Debtors to continue performing those agreements notwithstanding their rejection. Clearly, if the contracts at issue are not subject to being dealt with under section 365 of the Code or if, through a requirement to perform the contracts independent of this court's orders, rejection is ineffective to excuse Debtors from obligations found onerous, then there is no reason to grant the injunctive relief sought by Debtor.

1. *Code Section 365 Applies to the Back–to–Back Agreement and the TPAs*

■ For purposes of this discussion, the court will assume that the FPA gives the Commission jurisdiction over the contracts at issue. However, the court does not believe that jurisdiction would except those contracts from section 365 of the Code.

a. *The Plain Meaning of the Statute*

Any inquiry into whether section 365 applies must begin with the language of the statute itself. *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (stating that where resolution of a question of law turns on a statute, courts must look first to the statutory language). If the meaning of that language is clear, then the court should apply the statute according to its plain meaning. *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (stating that where a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms).[19]

Section 365(a) of the Code provides:

(a) Except as provided in section 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

18. The court need not address other forms of relief generally available to Debtors under section 365. However, though not argued by the parties, it would seem anomalous to give the bankruptcy courts authority to order rejection of contracts within the Commission's jurisdiction while denying it the power to order assumption or assumption and assignment. The last of these appears problematic to the court.

19. *See also Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (stating that in all statutory construction cases inquiry begins with the language of the statute itself and ceases if the language is unambiguous and the statutory scheme is coherent and consistent); *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (stating that analysis in any statutory construction case begins and ends with the language of the statute when the statutory language provides a clear answer); *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (stating that the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole); *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (stating that the fact Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to the statute's plain meaning).

The contracts discussed in the complaint are clearly covered by section 365(a). The Back–to–Back Agreement and the TPAs all contemplate continued performance by both Debtors and Pepco. Thus they are executory. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522–23, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (citing the legislative history of section 365(a) of the Code and holding that it indicates Congress intended the term "executory contract" to mean a contract on which performance remains due to some extent on both sides); *Phoenix Exploration v. Yaquinto (In re Murexco Petroleum)*, 15 F.3d 60, 62–63 (5th Cir.1994) (stating that an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party); *In re Tonry*, 724 F.2d 467, 468 (5th Cir.1984) (stating that, while the term executory contract is not defined by the Code, a contract is executory when something remains to be done by one or more of the parties).

Sections 765 and 766 are applicable only in the liquidation of a commodity broker. *See* section 103(d) of the Code. Sections 365(b) and (c) limit the ability of a trustee (or debtor in possession) to *assume* contracts and would have no affect on whether the Back–to–Back Agreement or the TPAs could be rejected. Section 365(d) deals with the performance and timing of assumption or rejection of leases and, again, limits assumption rights, not the ability to reject. Thus, the Back–to–Back Agreement and the TPAs clearly fall within the categories of contracts Congress intended to cover by section 365(a).

b. *Though Congress Excepted Some Contracts from Rejection, Those at Issue Are Not Among the Exceptions*

Congress has provided exceptions to (or limitations on) section 365(a) besides those in sections 765 and 766 of the Code.[20] Section 1113 provides special rules for rejecting a collective bargaining agreement. *See also* section 1114. Section 365(*o*) of the Code requires, in chapter 11 cases, the assumption of "any commitment by the debtor to a Federal depository institutions regulatory agency ... to maintain the capital of an insured depository institution...." This provision is of particular interest in that it requires exactly what Pepco and Commission may require of Debtors in performing the Back–to–Back Agreement: honoring a financial commitment which is economically disadvantageous but which falls within the purview of a regulatory agency.

Equally interesting are the provisions of subchapter IV of chapter 11 of the Code dealing with leases of railway lines. Sections 1169 of the Code makes special provision for operation of a railway line leased by the debtor after rejection of that lease. Section 1170 deals with abandonment of railway lines and gives the Surface Transportation Board a significant role in determining whether abandonment should be permitted by the court. *See also* sections 77(c)(6) and (*o*) (former 11 U.S.C. §§ 205(c)(6) and (*o*) of Bankruptcy Act of 1898). These provisions specifically require the bankruptcy court to take account of regulatory agencies and the public interest—again, the concerns expressed in the instant case by Pepco and the Commission.

Congress might also have excepted companies like Debtors—defined as public util-

---

**20.** Sections 765 and 766 are part of a procedure designed to mesh with the Commodity Exchange Act and specifically contemplate participation in the bankruptcy process by the Commodity Futures Trading Commission. *See* section 762 of the Code.

ities under the FPA (see 16 U.S.C. § 824(e))—from the Bankruptcy Code itself. Banks, for example, are ineligible for relief under the Code. See sections 109(b) and (d) of the Code. Insolvent banks are dealt with pursuant to Federal Deposit Insurance Act, 12 U.S.C. §§ 1811–1835, and the agency that regulates banks is designated to oversee the process.

In short, there is no reason to believe Congress intended that contracts like those at issue should be treated under the statute differently from other executory contracts. On the contrary, the plain meaning of section 365(a) and the absence of an exception for contracts under the Commission's jurisdiction in a statute including numerous other exceptions leads this court to the indisputable conclusion that the Back–to–Back Agreement and the TPAs are subject to rejection.

### c. *Caselaw Does Not Require a Contrary Conclusion*

Moreover, interpretative authorities do not require a contrary conclusion. The Supreme Court has held that when Congress has intended to exempt certain types of executory contracts from section 365, Congress has done so explicitly. See Bildisco, 465 U.S. at 521–22, 104 S.Ct. 1188; Sharon Steel Corp. v. Nat'l Fuel Gas Distr. Corp., 872 F.2d 36, 40 (3rd Cir.1989) (stating that the fact that one party to an agreement was a public utility and was regulated by the state public utility authority did not preclude rejection since Congress did not legislate special treatment for utility contracts rejected under section 365).

### 2. *Rejection of the Back–to–Back Agreement or the TPAs Would Constitute Effective Relief*

■ Having concluded that Debtors may, upon being so authorized by the court, reject the agreements which are the subject of this dispute, the court next must determine whether that relief would serve any purpose. If rejection of the Back–to–Back Agreement or the TPAs were to be followed (or preceded) by an order of the Commission which required Debtors to continue to perform those agreements, their rejection would be meaningless.

### a. *The Bankruptcy Code*

The Code is not on its face clear as to whether the Commission could order Debtors to perform a rejected contract. Section 365(g) merely states that rejection of a contract "constitute[s] a breach" by the debtor.

Other provisions of the Code, however, suggest that Congress did not intend that a debtor would have to perform a rejected contract. Section 1113 provides a specific mechanism for rejection of collective bargaining agreements which contemplates performance pending rejection. See section 1113(e). Section 1169 safeguards continued provision of rail service following rejection of a lease of a line. See section 1169. Section 365 itself requires partial performance by the trustee (or debtor in possession) following rejection of certain types of agreements. See section 365(h) (dealing with the tenant's rights where debtor-lessor rejects a lease); section 365(i) (dealing with a vendee's rights upon rejection by a debtor-vendor of a contract for the sale of realty); section 365(n) (dealing with a licensee's rights upon rejection by a licensor of a contract involving intellectual property); and section 365(o), discussed above.

■ These provisions suggest (as the authorities cited below establish) that rejection of a contract in most circumstances relieves the trustee (or debtor in possession) of any obligation to perform. The absence of a provision requiring any post-rejection performance of contracts involving supply or purchase of power or dealing

with public utilities,[21] strongly suggests Congress intended such contracts to be dealt with the same as other ordinary contracts.

Indeed, the provision of a limited exemption from the automatic stay for regulatory authorities, *see* section 362(b)(4), and regulatory approval of rate increases in a plan, *see* section 1129(a)(6), show that Congress was at least generally aware of the potential conflict between the Commission and a bankruptcy court. At a minimum, these provisions add weight to the conclusion that Congress did not intend that the Commission would be able to eviscerate the effect of a contract's rejection by forcing performance of that contract.

### b. *Caselaw Confirms Debtors May Not Be Required to Perform a Rejected Contract*

The effect of rejection of an executory contract is a breach. Courts have consistently held that the breach then gives rise to a claim for damages, which is, in turn, treated similarly to all other unsecured claims. *See Bildisco*, 465 U.S. at 518, 104 S.Ct. 1188; *Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir.2000); *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 42 (1st Cir.2003); *In re Legg*, 51 B.R. 444, 446 (Bankr.W.D.Va.1985); *In re Cardinal Export Corp.*, 30 B.R. 682, 684 (Bankr.E.D.N.Y.1983); *see also* 3 COLLIER ON BANKRUPTCY ¶ 365.09, 15th ed. Rev.

2003 (unless a contract is within one of the special categories established by Congress, the other party becomes an unsecured creditor).

### C. Injunctive Relief is Warranted in This Case

 Having established that the court *may* enjoin the Commission from acting, and having concluded that this court may under section 365 of the Code provide Debtors with effective relief from the Back–to–Back Agreement and the TPAs, the court must now turn to the question of whether, given the latter, it should undertake the former. The court concludes that injunctive relief is appropriate in this case. First, injunctive relief is appropriate because the court may use its equitable powers to enter an injunction to protect its jurisdiction. *See In re McCauley*, 2000 Bankr.LEXIS 306, *21 (Bankr.N.D.Tex. March 31, 2000); *FDIC v. Shearson–American Express, Inc.*, 996 F.2d 493, 499 (1st Cir.1993); *In re Martin–Trigona*, 737 F.2d 1254, 1261 (2nd Cir.1984).

Second, Debtors have shown entitlement to injunctive relief under section 105(a) of the Code. The court reviews each of the requirements for injunctive relief below.[22] The showing of the potential for irreparable harm also constitutes the basis for an injunction to protect the court's jurisdiction.

The elements the court must find to justify injunctive relief under Rule 65, here

---

**21.** Congress knew how to set special rules for utility service. *See* section 366 of the Code.

**22.** There are cases suggesting the tests for an injunction under section 105(a) are not so stringent as under FED. R. BANKR.P. 7065 (incorporating FED.R.CIV.P. 65). *See In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir.1993); *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978–79 (1st Cir.1995). The Commission suggests that Plaintiffs must meet the tougher standards of the All Writs Act to

justify injunctive relief. The "alternative standards" for relief under section 105(a), however, closely parallel those for injunctive relief under Rule 65. *See In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752–53 (Bankr.E.D.Pa. 1986). The court, like Plaintiffs, does not find a basis for a more stringent test; it appears the Commission may be asking the court to apply in this case the standard adopted by courts asked to stay *orders* of the Commission. There is no such order in effect here.

the alternative basis of its holding, are (1) relief is necessary to prevent irreparable harm to Plaintiffs; (2) the Plaintiffs are likely to prevail on the merits; (3) the potential harm to Plaintiffs outweighs the harm relief may cause Defendants; and (4) relief is consistent with public policy.[23]

### 1. Injunctive Relief is Necessary to Prevent Irreparable Harm

The irreparable harm analysis is complicated in this case because relief is sought not with respect to conduct by the Commission but, rather, to keep the Commission from taking actions in the future which it might not take. Thus, Plaintiffs must show that the action it is concerned with would cause irreparable harm and that it is probable the Commission will take that action if injunctive relief is not granted.[24]

### a. An Order by the Commission to Force Performance of the Back-to-Back Agreement or the TPAs Would Constitute Irreparable Harm

The Rejection Motion is pending before this court, and Debtors are considering similar action with respect to numerous other contracts including the TPAs. The benefit of rejection of a contract is that performance by the debtor (trustee) is no longer required. Rather, through breach as a matter of law, the rights of other parties to the contract are converted to unsecured claims.[25] See NGC, 208 F.3d at 504–05. The ability to reject executory contracts is one of the principal tools provided to a debtor in possession for the reorganization of its business. See Bildisco, 465 U.S. at 528, 104 S.Ct. 1188; NGC, 208 F.3d at 505. Obviously, to eliminate Debtors' ability to reject the Back-to-Back Agreement or the TPAs[26] would meaningfully decrease the benefits Debtors might otherwise realize through reorganization.

Pepco argues, however, that, even assuming Plaintiffs—and the court—are correct and the court's authority to authorize rejection of contracts trumps the Commission's power to order performance of the same agreements, the only harm to Debtors of allowing the Commission to proceed would be the delay inherent in appeals from any decisions reached by the Com-

---

**23.** See Hull v. Quitman County Bd. of Educ., 1 F.3d 1450, 1453 (5th Cir.1993) (" 'holding that' [b]efore a preliminary injunction may issue, the plaintiffs must show that (1) there is a substantial likelihood they will prevail ultimately on the merits, (2) there is a substantial danger they will suffer irreparable injury if an injunction does not issue, (3) the threatened injury outweighs any harm to the defendant resulting from the injunction, and (4) the injunction will not harm the public interest"); In re Commonwealth Oil Ref. Co., Inc., 805 F.2d 1175, 1189 (5th Cir.1986) (finding that "[t]he four prerequisites to the issuance of a preliminary injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party op-

posing the injunction; and (4) that the granting of the injunction will not disserve the public interest").

**24.** This test must be met as well for the court to enjoin the Commission on the primary basis of its decision—protection of its own jurisdiction.

**25.** In some circumstances, apparently not present here, the rejection of a contract could give rise to a secured or priority claim.

**26.** As discussed below, the court is not today required to decide whether rejection should (or even may) be authorized or what standard would apply for authorizing rejection. The issue before the court is whether the court should protect its authority to hear rejection motions and determine their effect.

mission. The court does not find merit in this argument. First, delay of, possibly, years is not consistent with the expedition with which a debtor's reorganization is expected to proceed. *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 371–72 (5th Cir.1987), aff'd 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (stating that bankruptcy courts have authority to terminate chapter 11 cases for unreasonable delay and that the norm is for plans of reorganization to be effectuated within a matter of months). Second, Debtors face a variety of time limits. *See, e.g.,* sections 365 and 1121 of the Code. It is doubtful that Debtors can meet these time constraints if the issue of performance of rejected contracts such as the Back–to–Back Agreement and the TPAs is up in the air.[27] Third, uncertainty as to Debtors' obligation to perform the Back–to–Back Agreement or the TPAs would frustrate not only formulation but even negotiation of a plan of reorganization. Fourth, as Pepco points out, these contracts are arguably intertwined with the APSA. *See* Pepco Response, p. 4. Neither the court nor Debtors will be able to grapple with the question of whether the Back–to–Back Agreement and the TPAs may be dealt with independently of the APSA while the question of Debtors' performance of obligations under those agreements remains. Finally, this court cannot possibly make an intelligent evaluation of the Rejection Motion—or disposition of many other contracts—without understanding the relationship of the APSA to the agreement before it and without being able to predict with certainty the consequences of rejection.

In sum, the delays and uncertainties created for the reorganization process by proceedings before the Commission independent of the court's control would undermine the value of section 365 in this reorganization case. That the Commission proceedings would be subject to a chain of appellate review different from that applicable to orders of this court exacerbates the problem.[28] This court, the District Court, and the Court of Appeals for the Fifth Circuit would be forced to defer consideration of many issues key to Debtors' reorganization until Commission proceedings reached finality—or would be forced to address weighty matters, including confirmation, without sufficient knowledge of what Debtors' future holds. The court thus concludes that there has been a sufficient showing of potential irreparable harm in this case.

b. *There Is Serious Risk the Commission Will Order Performance of the Back–to–Back Agreement or the TPAs If Not Stayed*

Events since entry of the TRO have convinced the court that the risk to its jurisdiction in this case is real and imminent. In the Complaint, the TRO Motion, and accompanying papers, Plaintiffs point to the Commission's conduct in the *NRG* case. Whether that example would be sufficient to support the grant of a preliminary injunction is open to question. However, in exploring ways for the Commis-

---

**27.** The court has already heard opposition to a motion to extend the time for assuming real property leases entered into in connection with the APSA. Yet, how Debtors deal with these leases may turn on performance of the contracts at issue and resulting treatment of the APSA.

**28.** At the September 10 hearing, counsel for the Commission pointed out to the court that procedural mechanisms may be used to deal with related cases in different circuits. Beyond the fact that such mechanisms may be unwieldy in dealing with multiple, distinct matters originating in each of the Commission and this court, there is no assurance that they could be successfully invoked.

sion to coordinate its activities with this court, counsel for the Commission has been crystal clear that the Commission will accept no arrangement that does not leave it free to enter orders directing continued performance of agreements by Debtors without notice, an opportunity for Debtors to be heard, or the opportunity for this court to act. Moreover, as noted above, several entities have filed papers with the Commission asking that the Commission direct that Debtors continue to perform the Back–to–Back Agreement and the TPAs, regardless of any action by the bankruptcy court. In fact, despite the TRO, the Commission has issued notices preparatory to consideration of those petitions.

In the face of these developments, the threat to this court's jurisdiction and Debtors' reorganization which may be posed by actions of the Commission is clear and present. The court, for this reason, is justified in enjoining the Commission to protect its jurisdiction. The first prong of the test for injunctive relief—irreparable harm—has also been met.

### 2. *Debtors Will Likely Prevail on the Merits*

The parties are not in agreement as to what measure should be used in assessing the probability of success prong of the test for injunctive relief. The court does not consider the choice of measure significant, however. Whichever is selected, Plaintiffs

are likely to prevail. If the court concludes injunctive relief is appropriate, then Plaintiffs' success on the merits of their Complaint is likely to follow, because a principal form of relief sought through the Complaint is an injunction. If the test is the likelihood of the Debtors reorganizing successfully, that, too, appears probable based on the record before the court. Finally, if the question is the likelihood of the Back–to–Back Agreement and the TPAs being subject to section 365,[29] that issue as well naturally falls Plaintiffs' way by reason of the conclusions reached by the court in this opinion.

### 3. *There is No Harm to Defendants in Staying the Commission*

Debtors are presently performing under the Back–to–Back Agreement and the TPAs. The court will not grant Debtors relief with respect to those agreements without notice to Defendants and an opportunity to be heard. If the Commission makes a persuasive showing, the court may well conclude that the standard for rejection of those agreements is more rigorous than the business judgment rule applied to most contracts. *See Bildisco*, 465 U.S. at 524, 104 S.Ct. 1188.[30] The court might even conclude that rejection of any given agreement should be contingent upon Commission approval.

Even if the court authorizes rejection of the Back–to–Back Agreement or the TPAs, the court would require that Debt-

---

**29.** The court is not, of course, ready to determine that Debtors will succeed with the Rejection Motion or rejection of the TPAs. The court has insufficient basis to decide how it will rule on those issues. Rather, the court here merely concludes that it is likely the Debtor–Plaintiffs will prevail in their effort to have the matter decided in this court.

**30.** A tenable argument might well be possible that protection of the public interest is an implicit condition to any agreement governed

by the FPA. If that is so, it would be reasonable for the court to set a higher than normal standard for rejection of the agreements at issue. It is one thing if the choice of the party to bear the loss under the Back–to–Back Agreement is between Debtors' creditors and Pepco. It would be quite another if the court must choose between Debtors' shareholders or (principally institutional investor) creditors and the general public.

ors continue to provide power necessary to maintain public services—albeit at market prices. Moreover, any rejection of a contract creates a claim. If Debtors reject contracts with Pepco, Pepco will be entitled to a claim for damages which will have to be satisfied on some basis.[31] Thus, there is no harm to Defendants in the grant of a preliminary injunction. The harm, if any, will only occur upon consideration of the Rejection Motion and further motions under section 365 of the Code and after notice and hearing.

While Defendants lose little other than a negotiating club through the grant of injunctive relief, the harm to Debtors' reorganization from granting to the Commission veto power over the effective use by Debtors of section 365 is incalculable. As the Commission has argued, Debtors have hundreds of contracts over which the Commission claims jurisdiction. The Back–to–Back Agreement and the TPAs are no more than the tip of the iceberg. If the Commission can control the issues surrounding those contracts, there is little chance this court can preside effectively over Debtors' reorganization. This amounts to eliminating chapter 11 as a

remedy for companies like Debtors—not likely a result Congress ever contemplated.

### 4. Public Interest

In the case at bar, the question of public interest is complementary to that of balancing of harm. Both the regulatory scheme overseen by the Commission and the reorganization process subject to this court's jurisdiction serve the public interest. However, whereas granting a preliminary injunction will not affect the reliability of electric service or Debtors' performance of their obligations under the agreements at issue, a failure to stay the Commission is likely to lead to frustration—or perhaps failure—of the reorganization process. The public interest is thus better served by granting injunctive relief.

### D. Defendants' Arguments Lack Merit

Defendants rely heavily on several cases for the proposition that this court should steer clear of the Commission's exercise of its jurisdiction. The court concludes that these cases, the most important of which are discussed below,[32] do not create a bar

---

**31.** Defendants seem to perceive rejection of a contract as interference in the Commission's authority to set rates. That is not so. If, for example, the Commission sets a rate under an agreement by which power is provided to an entity that becomes a debtor in bankruptcy, dealing with amounts due under that agreement (or, for that matter, under a tariff) as a claim to be satisfied in bankruptcy would not amount to changing the rate set by the Commission. Rejecting a contract like the Back-to–Back Agreement is no different. Indeed, if Debtors were destitute as opposed to in straitened circumstance, no effort by the Commission could cause payments by them of amounts due under the agreement. If permitted, rejection of the agreement will only reallocate the risk of loss, not change the rates. If, as it seems to claim, the Commission's powers extend to anything that could affect rates ultimately borne by the public, then the

Commission must have the power to police all manner of contracts. Collective bargaining agreements, construction contracts, and the supply of a utility's bathroom tissue could all affect what the public pays for service by a utility.

**32.** Defendants' other authorities on this issue do not aid them either. In re Nitec Paper Corp., 43 B.R. 492 (S.D.N.Y.1984), is distinguishable from the case at hand because Nitec dealt with the assumption of a contract and assignment. Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), is also distinguishable because the New Jersey Department of Environmental Protection entered its order prior to commencement of the bankruptcy case.

to the relief sought by Plaintiff and are not apposite to the situation faced by the court.

1. *NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy)*, 2003 WL 21507685, 2003 U.S. Dist. Lexis 11111 (S.D.N.Y.2003) *("NRG Power")*

*NRG Power* followed the sequence of events which led to the anomalous result that the Commission had ordered the debtor to perform a contract rejected by order of the bankruptcy court. The District Court was asked in *NRG Power* to, *inter alia*, direct that the debtor not perform under the contract.

Besides not being binding precedent, *NRG Power* presents a different set of facts from the case before this court. First, the Commission order was already in effect. Second, the bankruptcy court had refused to grant the debtor similar relief.

These distinctions are critical. As the *NRG Power* court noted, "under the elaborate statutory scheme created by the [Federal Power Act], only a federal court of appeals may exercise jurisdiction to review a [Commission] decision." *NRG Power Marketing, Inc. v. Blumenthal (In re NRG Energy)*, 2003 WL 21507685 at *4, 2003 U.S. Dist. Lexis 11111 at *3 (S.D.N.Y. 2003). In other words, unlike the instant case, in *NRG Power*, the horse was already out of the barn. This court agrees that neither it nor the District Court nor the Court of Appeals for the Fifth Circuit could *review and nullify* an order of the Commission respecting the Back–to–Back Agreement. That is precisely the point of granting injunctive relief: to prevent the Commission from stripping the court of a significant part of its jurisdiction to supervise the Debtors' reorganization. Absent an actual order of the Commission, this court retains its jurisdiction to act to prevent entry of such an order. Once an order was entered, collateral attack on that order would not be proper. *See, e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 313, 115 S.Ct. 1493, 1501, 131 L.Ed.2d 403 (1995).

Moreover, the decision in *NRG Power* was partly based on the need for efficient judicial administration. In that case, the District Court concluded its opinion with the observation that the Commission "asserted that it intended to act 'as expeditiously as possible'" and that "[t]he Court has no doubt that [the Commission] should, and will, continue to do precisely that. In the interest of efficiency, this Court will thus not interfere with the regulatory proceeding ... before [the Commission]." 2003 WL 21507685 at *4, 2003 U.S. Dist. LEXIS 11111, at *4. In the case before this court, efficiency is best served by delaying any regulatory action at this time.

2. *In re Cajun Electric Power Cooperative, Inc.*, 185 F.3d 446 (5th Cir. 1999) *("Cajun")*

*Cajun* obviously is binding precedent for this court. But, again, the differences between that case and this matter are significant. In *Cajun*, an administrative law judge recommended escrowing for potential rate adjustment amounts payable to debtor (a wholesaler power supplier) by reason of interest that the debtor would have accrued but for its bankruptcy filing. *See* section 502(b) of the Code. Debtor's trustee sought injunctive relief at that time, but the bankruptcy court denied it. *In re Cajun Electric Power Cooperative, Inc.*, 185 F.3d 446, 450 (5th Cir.1999). The state regulatory authority then ordered creation of the escrow, intending to determine whether the amounts escrowed should be refunded to customers *after* the

bankruptcy court decided if the debtor would pay to its creditors the interest represented by the escrow. Only then did the bankruptcy court enjoin the regulatory authority. *Id.*

Again, the bankruptcy court in *Cajun* acted *after* the regulatory agency made its determination. Moreover, *Cajun* directly involved the setting of rates. Finally, significantly unlike the case at bar, the regulatory agency recognized that *its* ultimate decision (whether to grant debtor's customers a refund) depended upon the bankruptcy court's disposition of those matters committed to *its* jurisdiction—specifically whether creditor claims should include interest. The Commission offers no similar deference to the reorganization process or this court.

Furthermore, the Court of Appeals specifically recognized that the bankruptcy court, in appropriate circumstances, could stay a regulatory agency. *Id.* at 452. The *Cajun* court stated, "We emphasize that our determination that the bankruptcy court abused its discretion is necessarily limited to the circumstances presented on this appeal." *Id.* at 453 n. 10. The court also stated, "The limits on [a regulatory] authority are unclear, as are the mechanics of how to deal with an order ... that exceeds any such limits.... Further, we are not presented with a case where there is evidence that [the regulatory authority's] actions ... will prevent a bankrupt utility from successfully reorganizing." *Id.* at 454. Thus, *Cajun* leaves ample room for this court in this case to act as necessary to protect its jurisdiction and the reorganization process.

3. *In re NextWave Personal Communications, Inc.,* 200 F.3d 43 (2d Cir. 1999) *("NextWave")*

*NextWave* is useful to Defendants in terms of its language respecting the primacy of regulatory schemes. However, *NextWave* again deals with an attempt in bankruptcy court to attack collaterally an administrative proceeding. *In re NextWave Personal Communications, Inc.,* 200 F.3d 43, 54 (2d Cir.1999). Further, in *NextWave,* the Second Circuit Court of Appeals was not dealing with an effort by an agency to abrogate the effect of a specific provision of the Bankruptcy Code. Indeed, when precisely that issue arose, the Supreme Court denied the regulatory authority such power. *See FCC v. NextWave Personal Communications, Inc.,* 537 U.S. 293, 123 S.Ct. 832, 840, 154 L.Ed.2d 863 (2003).

4. *Bd. of Governors v. MCorp Financial,* 502 U.S. 32, 112 S.Ct. 459 (1991) *("MCorp")*

The *Bd. of Governors v. MCorp Financial,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) case once again involved an effort to stop proceedings already underway. Perhaps even more significant, as argued by Debtors, the statutory framework governing the regulatory authority specifically prohibited injunctive relief to halt administrative proceedings. Finally, in *MCorp* the Court was not faced with the effective neutering of specific authority given by Congress to the bankruptcy court.

## V. *Relief*

As reflected in the foregoing discussion, this court has the power to prevent the Commission from taking steps to force Debtors to perform the Back–to–Back Agreement and the TPAs. Plaintiffs have satisfied the court such relief is warranted here. The arguments of Defendants are simply not persuasive; but the relief granted by this court should be as narrowly drawn as possible.

In the TRO, the court stayed the Commission from acting with respect to con-

tracts between Pepco and Debtors other than the Back–to–Back Agreement and the TPAs. While such a restraint is appropriate given the numerous agreements (including those presently at issue) governed by the APSA, it should be limited to permit action as to any of those other contracts by the Commission after ten days' notice. If Debtors do not seek further relief in this court with respect to any such contract (other than the Back–to–Back Agreement and the TPAs) after such period, the stay of the Commission as to same will terminate.

The court also believes the Commission should be a party in interest in these chapter 11 cases for all purposes. Accordingly, the court concludes and orders that the Commission shall receive notice and have standing to participate (to the extent it deems proper) in these cases pursuant to section 1109 of the Code and FED. R. BANKR.P. 2018(a).

## VI. *Conclusion*

It is not this court's wish to test its jurisdictional muscle against that of the Commission. Rather, this court intends to serve as a gatekeeper, protecting the reorganization process from unfettered interference through initiation of actions in other tribunals.

The court, by this Memorandum Opinion, adopts the restraints provided in the TRO, as limited on the record on September 10, pending entry of an order in proper form granting preliminary injunction. Debtors are directed to prepare and submit an order in conformity with this opinion continuing and extending such preliminary injunctive relief.

It is so ORDERED.